AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 1-7-2022)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Information associated with One (1) Target | ) | Case No.  **MJ23-104** |
| Accounts/Identifiers, for Investigation of 21 | ) | |
| U.S.C. § 841 & 846 and Other Offenses | ) | |

## APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I, a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachment A2, located in the Western District of Washington and elsewhere, there is now concealed property and evidence described in Attachment B. This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 841 & 846 | Distribution and Conspiracy to Distribute Controlled Substances |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits. Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

☒ Delayed notice of 90 days (give exact ending date if more than 30 days: June 1, 2023) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:
☑ reliable electronic means; or ☐ telephonically recorded

_____
*Applicant's signature*

Matt Blackburn, FBI Task Force Officer
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or
☒ The above-named officer provided a sworn statement attesting to the truth or the foregoing affidavit by telephone/

Date: March 3, 2023

_____
*Judge's signature*

Paula L. McCandlis, United States Magistrate Judge
*Printed name and title*

City and state: Seattle, Washington

USAO # 2022R01268

## ATTACHMENT A2

### Property to Be Searched and Subscriber/Subject Information

1.      Records and information associated with the cellular phone assigned call number (206) 602-8343, with listed subscriber Frank Graves and the subscriber address is 1175 Harrington PL NE, APT 201 in Renton, WA (the "Target Cell Phone"), that are in the custody or control of T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.  The subscriber/customer of the Target Cell Phone is Frank Graves.  The identity of the person who is the subject of the criminal investigation is Frank Graves and other known and unknown.

2.      The Target Cell Phone.

3.      The property to be searched includes:  (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

**ATTACHMENT B**

**Particular Things to Be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701- 2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127. As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Telephone described in Attachment A2. This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8). Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.    **Section I:  Information to be Disclosed by as the Wireless Provider**

1.    **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the Account listed in Attachment A2:

a.    Names (including subscriber names, user names, and screen names);

b.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.    Local and long distance telephone connection records for the last 60 days or two billing cycles, whichever is longer;

d.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions for the past 60 days or two billing cycles, whichever is longer;

e.    Length of service (including start date) and types of service utilized;

f.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

g.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.      Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.      **Prospective Cell Site Location Information.**

a.      All information about the location of the Target Telephone described in Attachment A for **a period of 45 days from activation**, during all times of day and night.  This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A2.

b.      The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A2**.**

3.      **Prospective E-911/GPS and Cell Site Triangulation Information.**

a.      All information about the location of the Target Telephone described in Attachment A2 for **a period of 45 days**, during all times of day and night.  This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A2.

b.      The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A2.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of the Wireless Provider. The Wireless Provider is required to disclose the Location Information to the government pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), the Wireless Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Wireless Provider's services.  The government shall compensate the Wireless Provider for reasonable expenses incurred in

Attachment B
Page 2 of 3
USAO 2022R01268

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

furnishing such facilities or assistance.

**II.     Section II:  Information to Be Seized by the Government**

1.       All information described above in Section I that will assist in investigating unidentified subjects who are engaged in violating 21 U.S.C. §§ 841(a)(1), and 846.

2.       All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.       Location Information regarding the Target Telephone described in Attachment A2.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Wireless Provider in order to locate the things particularly described in this Warrant.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR
## A VEHICLE & CELL PHONE TRACKING WARRANTS

STATE OF WASHINGTON      )
                         )      ss
COUNTY OF KING           )

I, Matt Blackburn, a Task Force Officer with the Federal Bureau of Investigation, Seattle, Washington, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

### Application for Tracking Warrant

1.      I am submitting this Affidavit pursuant to Rule 41 of the Federal Rules of Criminal Procedure in support of an applications for a warrant authorizing the real-time location tracking of the following vehicle for a period of 45 days:

a.      **Target Vehicle 1 (TV1)** a 2015 light blue Chevrolet Suburban, bearing Washington License plate CDL3026, registered to Frank Lozano Graves at 1175 Harrington PL NE, APT 201, Renton, Washington, as described in Attachment A1.

2.      **Target Vehicle 1** is believed to be currently located in this District and used to facilitate drug trafficking.

3.      We request permission to install/service the tracking device at any time, day or night, in order to ensure that we can do so covertly and avoid jeopardizing the ongoing investigation.  Investigators believe it would be safer for investigators to install the tracking device(s) during hours of darkness, to ensure the tracking device is installed in a covert manner. The address listed above are visible from neighboring residences, which makes it highly unlikely that investigators will be able to install or maintenance the tracking device in a covert manner during daylight hours.  Because we believe early morning hours or later evening hours are the safest time for installation and access to the vehicle, we request nighttime authorization.  Due to the covert nature of this installation, and in order to ensure the safety of the executing officers, I also request that the

Affidavit of Task Force Officer Matt Blackburn - 1
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

government be relieved of any requirements to leave a copy of the warrant in the premises entered, or the vehicles. The device will not monitor or record voice communications, nor will it interfere with the safe operation of **Target Vehicle 1**.

4.      I seek authority to do the following: (a) install, remove, monitor, repair, or adjust a global positioning satellite (hereinafter GPS) electronic tracking device on to **Target Vehicle 1** at any time of the day or night; (b) if necessary to protect the safety of persons installing, removing, monitoring, repairing, or adjusting the electronic tracking device on **Target Vehicle 1** or to protect the integrity of the investigation, to surreptitiously enter the subject vehicles at any time of the day or night, and move the subject vehicles from one location to another for the purpose of installing, removing, monitoring, repairing, or adjusting the device; and/or to tow the vehicles; (c) surreptitiously re-enter **Target Vehicle 1** at any time of the day or night, for the purpose of installing, removing, monitoring, repairing, or adjusting the device; and (d) continuously monitor any and all signals emitted from the electronic tracking device in any jurisdiction within the United States, including when the vehicle enters any structure or private property in which there may be a reasonable expectation of privacy. I request this authorization for a period of up to forty-five (45) days.

5.      **Target Vehicle 1** is registered to Frank Graves home address at 1175 Harrington PL NE, Renton, Washington. That property has a parking area accessible from the street.  I request permission to enter this property to install the GPS device.

6.      This is the **third** application in this judicial district for a tracking warrant for **Target Vehicle 1** in connection with this investigation.

### Application for a Tracking Warrant for a Target Telephone

7.      I also make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the following cellular telephone (the "Target Telephone"):

Affidavit of Task Force Officer Matt Blackburn - 2
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.    **Target Telephone 1 (TT1)** is a cellular telephone with telephone number (206) 602-8343, with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT1** is subscribed to Frank Graves and the subscriber address 1175 Harrington PL NE, APT 201, Renton, WA.

8.    **TT1** is described herein and in Attachment A2, and the location information to be seized is described herein and in Attachment B.

9.    This is the **third** request for a pen register/trap and trace and GPS location information on **TT1**, believed to be used by Frank Graves.[1]

ECPA

10.    The Court has jurisdiction to issue the proposed warrant under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is the Western District of Washington, a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

Pen Register Act

11.    Because this warrant seeks the prospective collection of information that falls within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

12.    The Court has jurisdiction to issue the requested pen-trap order because it is a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2).  Specifically, the Court

---

[1] Investigators initially received authorization to obtain pen register/trap and trace and GPS location information for **TT1** on November 17, 2022, under case number MJ22-555 PLM.  To correct an issue with the identified IMSI for **TT1**, investigators resubmitted the application for the warrant, which was granted on November 28, 2022, under case number MJ22-571 MLP.  The Court renewed this authorization on January 11, 2023, under case number MJ23-011. Again, to correct an issue with the identified IMSI for **TT1**, investigators resubmitted the application, which was granted on January 18, 2023, under case number MJ23-023.

Affidavit of Task Force Officer Matt Blackburn - 3
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

is a district court of the United States that "has jurisdiction over the offense being investigated." 18 U.S.C. § 3127(2)(A)(i).

13.     This application includes all the information required by the Pen Register Act.  See 18 U.S.C. §§ 3122(b) & 3123(a)(1).  Namely, Exhibit 1 to this application is a certification from Assistant United States Attorney Stephen Hobbs that (1) identifies the Drug Enforcement Administration (DEA) as the law enforcement agency conducting the investigation and (2) certifies the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by those agencies.  18 U.S.C. § 3122(b).  The Assistant United States Attorney is an "attorney for the government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

14.     A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted."  18 U.S.C. § 3127(3).  A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."  18 U.S.C. § 3127(4).

15.     In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls.  Similar principles apply to other kinds of wire and electronic communications such as emails, text messages, connection logs, and data transfers.  The prospective location data sought in this application constitutes "dialing, routing, addressing, and signaling information" covered by the Pen Register Act.  Accordingly, the requested warrant will record, decode, and/or capture dialing, routing, addressing, and signaling information associated with TT1 without geographic limit.

16.     The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order through Attachment B of the requested warrant that T-

Affidavit of Task Force Officer Matt Blackburn - 4
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Mobile Wireless, and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this warrant furnish, upon service of the warrant, information, facilities, and technical assistance necessary to install the pen/trap, including installation and operation of the pen-trap unobtrusively and with minimum disruption of normal service.  Any entity providing such assistance shall be reasonably compensated by the DEA, pursuant to 18 U.S.C. § 3124(c), for reasonable expenses incurred in providing facilities and assistance in furtherance of the warrant.

17.     Through this application, the United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).

**AGENT BACKGROUND**

18.     I am an investigative law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for, violations of the Controlled Substance Act, Title 21, United States Code, Section 801 *et seq*., and related offenses.

19.     I am a duly sworn member of the Seattle Police Department (SPD) and have been employed as a police officer since December of 2007. I am currently assigned to the SPD Gun Violence Reduction Unit (GVRU).  In May of 2022, I was assigned as a Task Force Officer (TFO) with the FBI. I am currently assigned to the violent crime, gang, and transnational organized crime squad in the Seattle, Washington Division of the FBI. I have approximately fourteen years of state law enforcement experience. I completed the Washington State Criminal Justice Commissions Basic Law Enforcement academy as well as the SPD Anti-Crime Team School and Undercover School.  I have also been trained and have experience in the handling and use of confidential informants. As an SPD officer, I have actively participated in investigations of criminal activity, including but not limited to: crimes against persons, crimes against property, fire and explosives-related crimes, and crimes involving the possession, use, and theft of firearms.

Affidavit of Task Force Officer Matt Blackburn - 5
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

I have also been a part of hundreds of narcotic investigations ranging from the street-level sale and consumption of drugs to international drug trafficking organizations.  I have been trained in the identification of illegal narcotics, their use, and how they are consumed and distributed.  As part of some of these investigations, I have developed and utilized confidential informants.  During these investigations, I have also participated in the execution of search warrants and the seizure of evidence indicating the presence of criminal violations. As a law enforcement officer, I have testified under oath, affirmed to applications of search and arrest warrants, and obtained electronic monitoring orders.

20.     In my role as a police officer and a member of the FBI Safe Streets Task Force, I have participated in gang investigations that have resulted in the arrest of individuals and the seizure of illicit narcotics and/or narcotics-related evidence, firearms, and the forfeiture of narcotics-related assets. I have been involved in the service of federal and state search warrants as part of these investigations. I am also familiar with the manner in which criminals, including gang members/associates, use telephones, often cellular telephones, to conduct their unlawful operations, and how they code their conversations to disguise their unlawful activities.

21.     I have drafted search warrants, tracking warrants, and other legal process in furtherance of investigations. I have executed search warrants for items such as controlled substances in residences and vehicles. I have used technology to include Global Positioning Systems (GPS) and cameras to monitor and locate subjects of criminal investigations. I have also conducted physical surveillance of persons, places, and things in furtherance of criminal investigations.

### SUMMARY OF PROBABLE CAUSE

22.     I have participated in the investigation described in this affidavit since September of 2022. I obtained the facts set forth in this affidavit through personal participation in the investigation described below, from oral and written reports of other law enforcement officers, from records, documents and other evidence obtained during

Affidavit of Task Force Officer Matt Blackburn - 6
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

this investigation, and from confidential sources and sources of information who are associated with, and knowledgeable about, the subjects of this investigation and their confederates. I have obtained and read official reports prepared by various law enforcement officers participating in this investigation and in the other related investigations by agencies referenced in this affidavit.

23.     When this affidavit refers to vehicle ownership, either I or other agents[2] involved in the investigation reviewed the relevant state vehicle records from the Washington State Department of Licensing (DOL), or the equivalent agency in other states. Similarly, when this affidavit refers to identification documents, either I or other agents involved in the investigation reviewed the relevant driver's license or similar records maintained by DOL, or the equivalent agencies in other states. When this affidavit refers to the criminal history of a subject, either I or other agents involved in the investigation reviewed the available criminal history from state or federal agencies. When this affidavit refers to telephone subscription records, either I or other agents involved in the investigation reviewed the subscriber records obtained from the telephone company by administrative subpoena or court order, or I obtained the information from other law enforcement officers familiar with this investigation. When this affidavit refers to telephone toll records, either I or other agents involved in the investigation received the information from the telephone company pursuant to an administrative subpoena or court authorized pen registers. When this affidavit refers to beliefs or conclusions of investigators, these beliefs and conclusions are based on the collective training and experience of the agents involved in this investigation.

24.     Since this affidavit is submitted for the limited purpose of securing renewed authorization for a tracking warrant on **Target Vehicle 1**, I have not included every fact

---

[2] When I use the term "agents" or "investigators" throughout the affidavit, I am referring to law enforcement personnel, including, but not limited to DEA and FBI agents and TFOs, SPD sergeants, detectives, and officers, as well as personnel associated with other state and federal law enforcement agencies.

Affidavit of Task Force Officer Matt Blackburn - 7
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

known to me concerning this investigation.  I have set forth the facts that I believe are necessary for a fair determination of probable cause for the requested warrant.

25.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of, and conspiracy to distribute, controlled substances), have been committed, are being committed, and will be committed by Frank Graves and members of the Graves DTO, both known and unknown, and that these members of the Graves DTO are using **Target Vehicle 1** in furtherance of these crimes.  Further, there is probable cause to believe that tracking of **Target Vehicle 1** will reveal evidence, contraband, fruits, and instrumentalities of these violations.  Obtaining the information sought in this Affidavit is necessary to further the investigation into these offenses.

Historical background of the Graves DTO

26.     The United States, including the FBI and the SPD, is conducting a criminal investigation of a regional drug trafficking organization, which investigators are referring to as the Graves DTO. The Graves DTO is believed to transport narcotics, including fentanyl pills, from the Las Vegas area to the Seattle area for redistribution. The targets of this investigation include Frank L. Graves (referred to as "Frank Graves"); his son, Frank M. Graves (referred to as "Frank Jr."); and Lionel Hampton.  Investigators believe that Frank Graves is distributing fentanyl pills within the Western District of Washington.

27.     In February of 2015, Frank Graves was arrested by the Kent Police Department for the sale of Oxycodone pills.  At the time of Frank Graves' arrest, police seized 391 pills from his person, 100 from his vehicle, 259 from his wife's vehicle, and 261 from his residence at 1175 Harrington PL NE, #201, in Renton, Washington (the address where **Target Vehicle 1** is registered in DOL records).  Frank Graves was charged in King County Superior Court and pled guilty to one count of conspiracy to possess with the intent to deliver Oxycodone and one count of unlawful possession of

Affidavit of Task Force Officer Matt Blackburn - 8
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Oxycodone.  He was sentenced to 30 days in jail on a work release program and one year under the Washington State Department of Corrections supervision.   He is not currently under supervision by any state or federal correction agency.

28.     In July of 2019, Frank Jr. was involved in a drug transaction where he sold fentanyl pills to two individuals who then attempted to rob him.  Frank Jr. shot both, killing one, and was shot himself in return.  At the time of the shooting, he was in possession of over $11,000 in cash and 500 Oxycodone pills, packaged in groups of 100.  Frank Jr. was charged with Unlawful Possession of a Firearm and Possession of Narcotics with the Intent to Deliver.  He pled guilty to Unlawful Possession of a Firearm in the Second Degree and received a sentence of 33 months.  He served his sentence in the Olympic Corrections Center – a state prison run by the Washington State Department of Corrections (DOC).  Frank Jr. was released from the Washington Department of Corrections custody on February 16, 2023, and is on electronic home monitoring at 1175 Harrington PL NE, APT 201.

Frank Graves $650,000 unexplained income (January to March, 2022).

29.     Investigators conducted a database check and obtained employment information from the Employment Security Department of Washington State for Frank L Graves, which showed no earned wages or income from January 1, 2019, through March 31, 2022.   Nevertheless, financial records show that, in 2022, bank accounts in Frank Graves's name received over $450,000 in cash deposits and over $200,000 from peer-to-peer applications, such as Zelle and Cash App.  Based on these large deposits in cash and peer-to-peer transactions, which have not been reported as income, as well as the information set forth elsewhere in this affidavit, agents believe based on their training and experience, that these deposits indicate that Frank Graves is likely earning money through illegal activity, to include drug trafficking.

//

//

Affidavit of Task Force Officer Matt Blackburn - 9
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Identification of **TT1** and registered address of **Target Vehicle 1**.

30.     **TT1** has service provided by T-Mobile, and subscriber records show that it is subscribed to Frank Graves at 1175 Harrington PL NE, APT 201 in Renton, WA, the same as the registered address for **Target Vehicle 1**.  Moreover, investigators have identified Frank and Frank Jr. as the individuals speaking on these calls based on familiarity with their voices, the greetings they use for each other, and most of the calls being associated with Frank Jr.'s PIN number.

31.     Specifically, based on my review of recorded jail calls and social media accounts for Frank Graves (discussed below), I am familiar with and recognize his voice as the person who always answers **TT1** in Frank Jr.'s calls.  Based on my review of jail calls, I further know that Frank Jr. as the person who places the calls described below, because the majority of the calls are associated with him in the respective correctional call systems, and Frank Graves often greets the person calling from the jail as "Frank." Moreover, inmates of the King County Jail and DOC facilities use individual identification, a PIN system, which links every call made to that specific inmate, though it is possible for an inmate to use another inmate's PIN.  Based on my training and experience, I know that users of the phone systems at the King County Jail and Washington DOC facilities, including both the incarcerated individuals and the people they call, are warned that the line is recorded prior to each call being connected.

Frank Jr., while incarcerated, discusses drug transactions with Frank Graves (**TT1**).

32.     At the beginning of July 2022, Frank Jr. self-surrendered to begin serving his sentence in the conviction described above.  During his time in state custody, Frank Jr. has made several calls to his father, Frank Graves, at the phone number (206) 602-8343 (**TT1**).

33.     When calling his father, Frank Jr. used the phone systems at county jails and state prisons, which were recorded. Throughout these recorded calls, Frank Graves and Frank Jr. used coded language to discuss the fact that Frank Graves was now

Affidavit of Task Force Officer Matt Blackburn - 10
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

handling Frank Jr.'s drug trafficking while Frank Jr. was incarcerated.  In addition, in some of the recorded calls, Frank Graves has been overheard completing drug transactions with others.  A selection of these calls is summarized below:

34.     Investigators believe that Frank Graves is trafficking fentanyl pills, based in part on these recorded calls.  For example, on October 16, 2022, at 8:28 a.m., Frank Jr. called **TT1** and spoke with Frank Graves from Coyote Ridge Correction Center on a recorded line.  During the conversation, the following exchange took place:

**Frank Graves (TT1):** Carlos, Little Carlos says what's up.

**Frank Jr.:** My Mexican dude?

**Frank Graves (TT1):** Yeah, he says he doesn't do candy, man, he was trying to explain to me his buddy does the candy.  He doesn't do it or some shit he was telling me.  He's like No I don't do it man I don't know how to do it.

**Frank Jr.:** Are you trying to sell your Cutlass?  How much you trying to sell your Cutlass for?

Based on my training and experience, I know that "candy" is a common slang term used to refer to fentanyl pills, and I believe that Frank Graves was commenting on a drug supplier familiar to Frank Jr. – "Carlos" – telling Frank Jr. that "Carlos" was no longer supplying fentanyl pills.  I further believe that Frank Jr., knowing that the call was being recorded, immediately changed the subject back to one of Frank Graves's vehicles.

35.     In addition, while talking to Frank Jr. on the recorded line, Frank Graves could be overheard on some of the recorded calls completing drug transactions with others.  For example, on July 7, 2022, in a call from Frank Jr. to **TT1**, Frank Graves can be overheard completing a drug transaction with an unknown female.  On the recorded call, the unknown female asks Frank Graves if he has "any other ones on you," and Frank Graves asks Frank Jr. to hold on.  The following discussion can then be heard:

**Frank Graves (TT1):** I just have the, um, I don't know what happened … I always do … I don't know, I'm sorry ... I don't have them on me.  You don't like these, right?

**Female:** [unintelligible]

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Frank Graves (TT1):** They are [unintelligible]

**Female:** [unintelligible]

**Frank Graves (TT1):** Man I'm sorry, here. I don't know what happened.

**Female:** Ok [unintelligible]. Let me take two of those then.

**Frank Graves (TT1):** 30. I'm sorry about that.

**Female:** Ok. That's fine. Just hit me later.

Based on my training and experience, I believe that Frank Graves is speaking to and conducting a drug transaction with an unknown female who is in the room with him. When he says that he doesn't "know what happened" and "doesn't have them on me," I believe that Frank Graves is apologizing for not having a particular drug that the female wants. The female then says that she will take "two of those" instead, indicating that she will purchase a drug that Frank Graves does have with him. When Frank Graves immediately responds with "30," I believe that he is referring to the price for that quantity of the unknown drug he is providing to the female.

36.    Finally, on December 27, 2022, at 8:18 p.m. Frank Jr. called Frank Graves on **TT1** from the Olympic Corrections Center on a recorded line. During the conversation, the following exchange took place:

**Frank Graves (TT1):** But anyways, real quick, Webb [Desean Harrison], man I got Foo calling him, I got X calling him, I got 2K [Kamal Brown] calling him, man this cat, man ran off with it on me, man. They said he is getting hezigh or something. I don't know man. I got all the n**er's calling him. And X is like, man, I'll just give it to you and get with him later. I was like man, please man, because X fucks with him, you know what I mean.

**Frank Jr.:** Yeah.

**Frank Graves (TT1):** And X is my guy. So he is like, man, I'm just going to give it to you, bro. I'm like, yeah, thanks. And I'll just get with him later. You know what I mean?

**Frank Jr.:** Yeah. I wonder why [they talk over each other] off the deep end right now.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Frank Graves (TT1):** I don't fucking know. But man, [the talk over each other] I treated that guy like, I treated that guy, hey you and me treated him like family, man, that's what I'm, I don't get it man. You know.

**Frank Jr.:** This the thing, though. Sometimes that shit gets the best of you.

**Frank Graves (TT1):** They said, they said he snezorts [unintelligible] a little.

**Frank Jr.:** Ah yeah that's, it's kicking ass right now.

**Frank Graves (TT1):** No, the homies, the homies sezaid he seen him doing it, man, he's just and X is like yeah he does that to me too. I'm like, shit.

**Frank Jr.:** That's when you know you are gezone, that's one step away from those other ones.

**Frank Graves (TT1):** God man. Its all bad, bro. But the homies? Come on, man. Yeah, your boy Foo is killing it, man. I talked, I talked to Foo, he happened to be on the bezone, and ah, and ah, what's it called, Waikiki or whatever, he said he is buying homes down there or some shit.

**Frank Jr.:** In Hawaii?

**Frank Graves (TT1):** ummmhmmm. Yeah he is buying homes, shit. Yeah.

The talk over each other.

**Frank Jr.:** He's buying houses in Atlanta and shit.

**Frank Graves (TT1):** Uh, well he is in Waikiki, I just got off the phone with him.

**Frank Jr.:** Yeah, Foo's up right now.

**Frank Graves (TT1):** Yeah, that dude is not playing. Yeah, he's smoother than silk, man.

**Frank Jr.:** Who would have thought.

Based on my training and experience, I believe Frank Graves is claiming that Desean Harrison owes him a debt of two thousand dollars – likely for narcotics. He has numerous friends attempting to intercede for him, including Kamal Brown. Frank Graves and Frank Jr. believe Harrison has started using drugs and that's impacting his ability to function within the business. They then talk about an unknown person, "Foo," who is also selling narcotics and purchasing property.

//

//

Affidavit of Task Force Officer Matt Blackburn - 13
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Evidence of drug trafficking on Frank Graves social media.

37.     Frank Graves' publicly viewable social media further indicates that he is engaged in drug trafficking. A selection of these messages is summarized below:

38.     On November 9, 2022, at approximately 3:00 p.m., Frank Graves posted a selfie-style video on his Instagram account: @frank_e_fresh_206.  In the video, Frank Graves says the following to the camera:

**Frank Graves:** If you want a thrill in your life, put a pill in your life.

[As he said this, he mimicked flipping something into his mouth.]

**Frank Graves:** For rig-a-deal fo shig-a-dil.  Fresh Fresh man.  I mean.  Out here doing the [unintelligible] man.  It aint gonna stop.  Every since I was a youngster man, I've been doing this shit man.  Running.  Fast man.  Doing my thing thing.  You know what I mean.  Elvis mother-fucking-freshly man.

39.     Based on my training and experience, I believe that Frank Graves is discussing his drug trafficking business in this video, specifically by encouraging people to take pills – likely fentanyl pills.

40.     On December 1, 2022, at approximately 10:00 a.m., **Target Account 1** shared a publicly viewable video in which Frank Graves can be seen wearing an orange hoodie sweatshirt beneath a white and black letterman's style jacket and an orange beanie.  Frank Graves then spoke the following to the camera:

**Frank Graves:** Man, about my paper [money] man.  You guys, about your money, they be like 'it's snowing, it's this, it's that.'  Hey, I'll wouldn't give a damn if it was snow, ah, nails man.  I'm getting out and getting my money, man.  If I'm in a wheelchair, I'm gonna be rolling to the block.  Man, you know what I'm saying.  I wouldn't give a fuck.  Aint nothing gonna stop me from getting some money, man.  Believe that, man.  Elvis Freshly, man.  I'm a hustler's hustler, man.  Franke Yadeda Hollar.  I mean.  Shit you can't do nothing without the money, you know what I mean.  So don't let shit stop you from getting some mother-fucking paper [money], man.  At all costs, man, get your money, man.  You know.  Be a duffle-bag boy.  I mean.  You know.  Yeah.  But anyway.  I just be.  A little motivation for this morning.  Man, don't let shit stop you.  I don't give a fuck if it was a blizzard, man.  I'm getting out the fuck here and getting some of my mother fucking –

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

At this point in the video, it cuts off.  Based on my training and experience, I believe that Frank Graves is discussing his drug trafficking business in this video.  I know that that, on December 1, 2022, there was a significant snowstorm in the Seattle area.  In the video, Frank Graves is saying that he would not let the snow get in the way of making "paper," a common slang term for money.  Based on my training and experience, I believe that individuals looking for drugs would understand from this video that Frank Graves remained open for business during the snowstorm, while other drug suppliers may not.  Frank Graves also says that he is a "hustler's hustler," with "hustler" being a term commonly used to refer to a drug dealer.

Frank Graves uses multiple vehicles.

41.     Investigators have observed Frank Graves driving multiple vehicles in the time that they have been conducting physical surveillance of him, and he has six vehicles registered in his name at the 1175 Harrington PL NE address in Renton.  Vehicles registered to frank Graves at this address include:

- BUB3290 – 2012 Red Ford Focus
- 81259CV – 1972 Gold Oldsmobile Cutlass
- BZF3229 – 2008 Black Mercedes GL
- CDL3026 – 2015 Light Blue Chevy Suburban
- D02832A – 2004 Black Dodge Ram
- CFH8021 – 2006 Silver Cadillac DTS

42.     Investigators believe that Frank Graves regularly switches out the vehicles that he uses to conduct his drug trafficking, a tactic commonly used by drug traffickers in an effort to avoid detection by law enforcement or rival drug traffickers.

Surveillance of Frank Graves engaged in suspected drug transactions.

43.     Investigators have also conducted physical surveillance of Frank Graves and have observed him conduct suspected hand-to-hand drug transactions on multiple occasions.  Based on their observations, investigators believe that Frank Graves typically

Affidavit of Task Force Officer Matt Blackburn - 15
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

conducts his drug transactions in public parking lots, which he gets to either by walking from his residence at 1175 Harrington PL NE in Renton or by driving one of several vehicles registered to him (including **Target Vehicle 1**). Investigators have observed Frank Graves conduct suspected drug deals with several different individuals, with the meetings lasting for very short periods of time.

44.    Investigators have observed Frank Graves repeatedly conducting suspected drug transactions at certain locations, including the Rite Aid located at 2116 Sunset Blvd NE, the McDonalds restaurant located at 73 Rainer Ave S, and the Popeyes Louisiana Kitchen located at 105 SW 7 ST, all in Renton, Washington. During these suspected drug transactions, Frank Graves drives into the parking lot, meets another person in his own vehicle or in their vehicle, and then leaves the area in his own vehicle after a short period of time. While at these locations, investigators have seen Graves actually enter the business at the address only once, and he was inside the store for less than a minute. Based on my training and experience, having watched Frank Graves make over a dozen of these types of contacts, agents believe Frank Graves is executing drug transactions during these visits.

45.    A summary of some of these surveillance observations is set forth below:

46.    On November 9, 2022, investigators conducted physical surveillance in the parking lot of the Rite Aid located at 3116 Sunset Blvd NE in Renton, Washington, which is located near Frank Graves' residence at 1175 Harrington PL NE, #201, in Renton, Washington. At approximately 8:10 p.m., investigators saw a white Dodge Ram pickup enter the lot and park one parking spot away. The vehicle appeared to have only one occupant, and it backed into the parking spot and turned out its lights. Nobody exited the vehicle, which is unusual in a commercial parking lot. At 8:19 p.m., investigators saw a light-skinned black male walk up to the driver's side window of the white Dodge Ram. This male was wearing a black puffy coat, a pink hoodie underneath with the hood pulled up and blue jeans with something embroidered on them. Based on the person's physical

Affidavit of Task Force Officer Matt Blackburn - 16
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

characteristics, including his height and weight, and clothing, which matched clothing investigators had seen in a video shared by Frank Graves's Instagram account, @frank_e_fresh_206, earlier in the day, investigators believed that this person was Frank Graves. Investigators saw the man hand something through the driver's side window to the occupant of the white truck, and the driver handed something back. The white truck then pulled out and left the parking lot while the man who arrived on foot walked away westbound on NE 12th Street towards Harrington PL NE, where Graves' condo is located. Investigators used their vehicle to follow and then drive next to the man who had arrived on foot, who was looking at a cell phone and had his face illuminated by the screen. At that point, investigators recognized that person as Frank Graves, based on comparison to his Washington State Department of Licensing photo. Based on my training and experience, this short interaction in the parking lot, in which the two individuals met briefly and exchanged something by hand, is consistent with a hand-to-hand drug transaction.

47. On December 8, 2022, investigators conducted physical surveillance on Frank Graves. At approximately 8:30 a.m., investigators observed Graves leave his residence at 1175 Harrington PL NE in Renton, Washington. At approximately 11:30 am, investigators saw Frank Graves, driving TV1, stop in the parking lot of Popeye's Chicken at 105 SW 7 ST in Renton, Washington. A chaotic scene erupted, with multiple individuals surrounding Frank Graves's vehicle and getting in and out of the car in rapid succession. First, a white male got into the front seat of **Target Vehicle 1** and an unknown race male got into the back seat. Investigators lost sight of **TV1** for a few moments and when they were able to see **TV1** again, those two males had exited the vehicle. A 2019 red Jeep Renegade bearing Washington license plate BTN4146, registered to Latoya L Shavers (DOB: xx-xx-79) from Renton, Washington, then entered the lot along with a blue Acura with the Washington license plate CDU9925 registered to Benjamin Harris (DOB: xx-xx-96) from Renton, Washington. A black female from the

red jeep got into **TV1**.  A black female wearing a Seahawks jersey and an unknown race male wearing a pink sweatsuit got into **TV1**.  Within minutes, the female and male exited **TV1** and left the area in their respective vehicles.  Based on my training and experience, I believe Graves' brief interactions with these individuals was indicative of drug transactions with Graves supplying these individuals with drugs in exchange for money.

48.    On February 10, 2023, at approximately 9:14 a.m., GPS data placed **TT1** within range of Frank Graves' home at 1175 Harrington Place Northeast in Renton, Washington.  Investigators conducting physical surveillance in the area observed Frank Graves leave the building and enter the driver's side of Target Vehicle 2, which was parked on Harrington Place Northeast.  Frank Graves drove a block and half east and pulled into the parking lot of the Rite Aid at 3116 Sunset Blvd NE, where investigators had observed him conduct suspected narcotics transactions in the past (see above).  A black female got out of a light-colored SUV and contacted him but after some words got back into the SUV while Frank Graves entered the Rite Aid.  At 9:16 a.m., investigators observed Frank Graves leave the Rite Aid and contact the black female in the SUV, where they exchanged items through the driver's side window.  Frank Graves then moved to a red pickup, backed into a parking spot on the south side of the parking lot, opposite the SUV, and got into the passenger seat.  At 9:17 a.m., Frank Graves got out of the pickup and returned to Target Vehicle 2.  All three of these vehicles then left the parking lot.  Based on their training and experience, agents believe that Frank Graves was conducting hand-to-hand drug transactions.  GPS data placed **TT1** within range of the Rite Aid parking lot during these suspected drug transactions.

**Target Vehicle 1** used to facilitate suspected drug transactions.

49.    On January 20, 2023, when United States Magistrate Judge S. Kate Vaughan signed a tracking warrant for **Target Vehicle 1**, which investigators believed was used by Frank Graves in furtherance of drug trafficking.  The location information

Affidavit of Task Force Officer Matt Blackburn - 18
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

collected for **TV1** during the period from January 20, 2023, to the present show that Frank Graves is continuing to use **TV1** in furtherance of drug trafficking.

50.     A summary of some of these surveillance observations of **Target Vehicle 1** are set forth below:

51.     On February 12, 2023, GPS data for **TV1** showed that it entered the McDonalds parking lot, listed above, at 11:12 a.m. and left at 11:16 a.m.  It then moved to the Rite Aid parking lot at 2:22 p.m. and left at 2:28 p.m.

52.     On February 13, 2023, GPS data for **TV1** showed it entered the McDonalds at 10:53 a.m. and left at 10:58 a.m.

53.     On February 14, **TV1** makes a similar short visit to Rite Aid (entered at 9:04 a.m. and left at 9:11 a.m.), two visits to McDonalds (entered at 9:27 a.m. and left at 9:31 a.m. then entered again at 1:03 p.m. and left at 1:04 p.m., and one visits to Popeyes (entered at 4:13 p.m. and left at 4:18 p.m.).

54.     On February 15, **TV1** makes another short visit to McDonalds. GPS data showed Target Vehicle 1 entered the McDonalds at 8:35 a.m. and left at 8:38 a.m.

55.     Based on my training and experience and knowing that Frank Graves has used **Target Vehicle 1** to conduct drug transactions, the movement of this vehicle to locations where investigators know he has conducted these transactions in the past, and the shortness of each stay at those locations, investigators believe that Frank Graves is using Target Vehicle 1 to conduct drug transactions.

## KNOWLEDGE BASED ON TRAINING & EXPERIENCE

Common Characteristics of Drug Traffickers

56.     Based upon my experience and training with the FBI as well as conversations I have had with other agents and law enforcement officers who specialize in narcotics investigations, including investigations into the laundering of narcotics trafficking proceeds, I am familiar with the methods, tactics, and techniques utilized by narcotics trafficking/money laundering organizations. I have spoken with federal agents,

Affidavit of Task Force Officer Matt Blackburn - 19
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

as well as other law enforcement officers, about their experiences and the results of their investigations and interviews. Through my conversations with these agents and other law enforcement officers, I am knowledgeable in the methods and modes of narcotics trafficking/money laundering operations.

57.     Based on my training and experience, I know narcotics traffickers often require the use of one or more communication facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. I know international and domestic narcotics trafficking organizations often depend on maintaining timely long-distance and local connections between original sources of supply and those down the organizational chain. Narcotics traffickers utilize a variety of communication methods, including telephone communications, encrypted messaging applications, and email. I also know narcotics traffickers often use fraudulent information to subscribe to communication facilities, and frequently change communication facilities to thwart law enforcement efforts to intercept their communications.

58.     Based on my training and experience, and my discussions with other experienced officers and agents involved in drug investigations, I know that drug dealers use cellular telephones as a tool or instrumentality in committing their criminal activity. They use them to maintain contact with their suppliers, distributors, and customers. They prefer cellular telephones because they can be purchased without the location and personal information that land lines require. They can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs. They can also be passed between members of a drug conspiracy to allow substitution when one member leaves the area temporarily. I also know that it is common for drug traffickers to retain in their possession phones that they previously used, but have discontinued actively using, for their drug trafficking business.

Affidavit of Task Force Officer Matt Blackburn - 20
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes.

Use of Location Data

59.     In my experience, the geographic location information requested in this Affidavit is useful in drug trafficking investigations as the information can be used to: (1) aid surveillance during suspected drug deals; (2) help locate and identify target residences, stash houses, and other storage locations; (3) help identify where known and unknown conspirators live and the vehicles they drive; (4) help identify sources of supply, customers, and other unknown conspirators who assist in the distribution of narcotics and/or help launder the cash drug proceeds; (5) help understand geographic breadth of the Drug Trafficking Organization (DTO) how and where conspiracies operate; (6) help identify locations of money transfer businesses used by members of the conspiracy to launder cash drug proceeds or through which money is exchanged between co-conspirators; and (7) help identify transportation sources used by the conspirators.

60.     Based upon my training and experience, one way to identify co-conspirators is to covertly follow target telephones with the use of electronic tracking, known to be utilized in furtherance of drug trafficking and money laundering offenses, and then conduct an investigation using the addresses the vehicles/devices travel to. Based upon the location information, I would then direct other investigators to conduct surveillance at the addresses and determine if criminal activity was occurring there, which in turn could lead to potential names of conspirators and potential narcotics storage locations used by the DTO.  Obtaining this location information is critical to accurately identifying such co-conspirators and locations, as the residences of the targets are often times in either remote, rural areas, or small residential neighborhoods, which make close, physical surveillance by agents almost impossible to accomplish without being discovered by the suspects.

Affidavit of Task Force Officer Matt Blackburn - 21
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

61.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by pen-traps and indicate the identity of the cellular device making the communication without revealing the communication's content.  Currently, **TT1** has an IMEI number of 356011265967670.

62.     Based on my training and experience, I know that when a cell phone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower, and the cellular antenna or tower records those identifiers as a matter of course.  The unique identifiers -- as transmitted from a cell phone to a cellular antenna or tower -- are like the telephone number of an incoming call.  They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content.  In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents.

63.     Based my training and experience, I know that a cell phone can also be used to exchange text messages with email accounts.  The email addresses associated

Affidavit of Task Force Officer Matt Blackburn - 22
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

64.     Based on my training and experience, I know that cellular phones can connect to the internet via a cellular network. When connecting through a cellular network, internet communications sent and received by the cellular phone each contain the same unique identifier that identifies cellular voice communications, such as an ESN, MEIN, MIN, SIM, IMSI, MSISDN, or IMEI. Internet communications from a cellular phone also contain the IP address associated with that cellular phone at the time of the communication. Each of these unique identifiers can be used to identify parties to a communication without revealing the communication's contents.

65.     In my training and experience, I have learned that T-Mobile Wireless is a company that provides cellular telephone access to the general public. I also know that certain providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data (also known as GPS data or latitude-longitude data) and cell-site data (also known as "tower/face information" or cell tower/sector records). E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the cell towers (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

Affidavit of Task Force Officer Matt Blackburn - 23
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

66.     Based on my training and experience, I know that cellular service providers such as T-Mobile Wireless can collect E-911 Phase II data about the location of **Target Telephone 1** including by initiating a signal to determine the location of **Target Telephone 1** on its respective network or with such other reference points as may be reasonably available.

67.     When using a cellular connection to receive or transmit data, a cellular phone typically utilizes a cell tower to make telephone calls, send or receive text messages, send or receive emails, surf the internet, carry out application initiated data transfers, among other things.

68.     Based on my training and experience, I know that cellular service providers such as T-Mobile Wireless can collect cell-site data about **Target Telephone 1**.  Based on my training and experience, I know that for each communication (including data connections) a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as T-Mobile Wireless typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

69.     Different service providers use different systems, applications, and reports to collect or analyze cell site data.  These systems, applications, and reports are referred to by a variety of names including, but not limited to real-time tool or "RTT" (T-Mobile), Periodic Location Updates or "PLU" (T-Mobile), per call measurement data or "PCMD" (Sprint), Network Event Location System or "NELOS" (AT&T), EVDO, ALULTE, Timing Advance, and TruCall.  RTT data, for example, estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which

Affidavit of Task Force Officer Matt Blackburn - 24
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

70. Based on my training and experience, I know that wireless providers such as T-Mobile Wireless and typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such T-Mobile Wireless typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Telephone's user or users and may assist in the identification of co-conspirators and/or victims.

Modern cell phones allow users to switch their telephone numbers, use multiple telephone numbers on a single device, and transfer their telephone number to a different cell phone. These changes can be made with the assistance of the wireless provider or by taking actions such as changing the "SIM card" (short for "subscriber identity module card") of a cellphone. To provide for any such changes made to **Target Telephone 1**, Attachment A2 specifies that the property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number

Affidavit of Task Force Officer Matt Blackburn - 25
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

### AUTHORIZATION REQUEST FOR TARGET TELEPHONE

71.     Based on the foregoing, I request that the Court issue the proposed search warrant and pen-trap order, pursuant to Federal Rule of Criminal Procedure 41, 18 U.S.C. § 2703(c), and 18 U.S.C. § 3123.

72.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice to the subscriber(s) or user(s) of **TT1** until 90 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

73.     I further request that the Court direct T-Mobile Wireless to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Mobile Wireless.  I also request that the Court direct Mobile Wireless to furnish the government all information, facilities, and technical assistance

Affidavit of Task Force Officer Matt Blackburn - 26
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Mobile Wireless services, including by initiating a signal to determine the location of **TT1** on Mobile Wireless network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The agency shall reasonably compensate Mobile Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

74.    Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant by serving the warrant on the respective cellular service providers.  Because the warrant will be served on Mobile Wireless, who will then compile the requested records and data, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.  I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **TT1** outside of daytime hours.

## AUTHORIZATION REQUEST FOR TARGET VEHICLE

75.    I seek authority to do the following: (a) install, remove, monitor, repair, or adjust a global positioning satellite (hereinafter GPS) electronic tracking device on to **Target Vehicle 1** at any time of the day or night; (b) if necessary to protect the safety of person installing, removing monitoring, repairing, or adjusting the electronic tracking device on **Target Vehicle 1** or to protect the integrity of the investigation, to surreptitiously enter the subject vehicle at any time of the day or night, and move the subject vehicle from one location to another for the purpose of installing, removing, monitoring, repairing, or adjusting the device; and/or to tow the vehicle; (c) surreptitiously re-enter **Target Vehicle 1** at any time of the day or night, for the purpose of installing, removing, monitoring, repairing, or adjusting the device; and (d) continuously monitor any and all signals emitted from the electronic tracking device in any jurisdiction within the United States, including when the vehicle enter any structure

Affidavit of Task Force Officer Matt Blackburn - 27
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  or private property in which there may be a reasonable expectation of privacy. I request

2  this authorization for a period of up to forty-five (45) days.

3  76.     I further request permission to enter the private property located at 1175

4  Harrington PL NE, Renton, Washington (Frank Graves home address) to install the GPS

5  device.

6  77.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of

7  Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to

8  delay notice to the owner(s) or user(s) of **Target Vehicle 1** until 90 days after the

9  collection authorized by the warrant has been completed. There is reasonable cause to

10  believe that providing immediate notification of the warrant may have an adverse result,

11  as defined in 18 U.S.C. § 2705. Providing immediate notice to the user(s)/owner(s) of

12  the Target Vehicle would seriously jeopardize the ongoing investigation, as such a

13  disclosure would give that person an opportunity to destroy evidence, change patterns of

14  behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1).

15  **REQUEST FOR SEALING AND DELAYED NOTICE**

16  78.     To avoid seriously jeopardizing this ongoing, multi-state investigation into

17  this DTO and to avoid the risk of the suspects' potential flight from prosecution and

18  destruction of evidence prior to indictment, I request that the Court order the application,

19  this affidavit, the prior affidavits, the tracking warrants, and the returns, be sealed until

20  further order of the Court. These documents discuss an ongoing criminal investigation

21  that is neither public nor known to the targets of the investigation. Based upon my

22  knowledge, training, and experience, it is my belief that making these documents publicly

23  available and providing immediate notification of the execution of these warrants will

24  have an adverse result on this investigation, as defined at Title 18, U.S.C., Section 2705

25  (a)(2), and would likely result in the targets' flight from prosecution, the destruction of or

26  tampering with evidence, the intimidation or retaliation against the CS and other potential

27  witnesses, and otherwise seriously jeopardize the ongoing investigation. Accordingly,

28

Affidavit of Task Force Officer Matt Blackburn - 28
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   there is good cause to seal these documents because their premature disclosure may

2   seriously jeopardize that investigation.  For the same reasons, and because this

3   investigation is likely to take at least 90 days to conclude, given its breadth and

4   geographic scope, which includes agencies operating in California and Oregon among

5   other locations, I request a delay of 90 days to provide requisite notice I request

6   permission to delay providing the requisite notice of the tracking warrants for a period of

7   90 days and, if needed, may seek an extension of this request at that time.

8

9                                             Matt Blackburn, Affiant
                                              Task Force Officer
10                                            Federal Bureau of Investigation

11

12

13          The above-named agent provided a sworn statement to the truth of the foregoing

14   affidavit by telephone on the __3rd__ day of March, 2023.

15

16                                            PAULA McCANDLIS
17                                            United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28

Affidavit of Task Force Officer Matt Blackburn - 29                    UNITED STATES ATTORNEY
USAO 2022R01268                                                        700 STEWART STREET, SUITE 5220
                                                                       SEATTLE, WASHINGTON 98101
                                                                       (206) 553-7970

1    **EXHIBIT 1**

2

3    <u>DECLARATION</u>

4    I, Stephen Hobbs, declare as follows:

5    1.    I am a duly appointed Assistant United States Attorney for the Western

6    District of Washington, and I have primary responsibility for representing the interests of

7    the United States herein.

8    2.    I make this declaration in support of an application for a search warrant

9    pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) with

10   an integrated pen-trap order pursuant to 18 U.S.C. §§ 3122 and 3123.

11   3.    Pursuant to 18 U.S.C. § 3122(b), I certify that the FBI is the law

12   enforcement agency conducting the investigation in this matter and that the information

13   likely to be obtained from the requested warrant is relevant to an ongoing criminal

14   investigation being conducted by that agency.

15   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

16   Application is made on the basis of information officially furnished, and on that basis I

17   verily believe such information to be true.

18   Executed this 3rd day of March, 2023.

19

20                                              *s/ Stephen Hobbs*
                                                STEPHEN HOBBS
21                                              Assistant United States Attorney

22

23

24

25

26

27

EXHIBIT 1
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A2**

**Property to Be Searched and Subscriber/Subject Information**

1.      Records and information associated with the cellular phone assigned call number (206) 602-8343, with listed subscriber Frank Graves and the subscriber address is 1175 Harrington PL NE, APT 201 in Renton, WA (the "Target Cell Phone"), that are in the custody or control of T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.  The subscriber/customer of the Target Cell Phone is Frank Graves.  The identity of the person who is the subject of the criminal investigation is Frank Graves and other known and unknown.

2.      The Target Cell Phone.

3.      The property to be searched includes:  (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

**ATTACHMENT B**

**Particular Things to Be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701- 2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127. As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Telephone described in Attachment A2. This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8). Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.      **Section I:  Information to be Disclosed by as the Wireless Provider**

1.      **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the Account listed in Attachment A2:

       a.      Names (including subscriber names, user names, and screen names);

       b.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

       c.      Local and long distance telephone connection records for the last 60 days or two billing cycles, whichever is longer;

       d.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions for the past 60 days or two billing cycles, whichever is longer;

       e.      Length of service (including start date) and types of service utilized;

       f.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

g.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.      Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.      **Prospective Cell Site Location Information.**

a.      All information about the location of the Target Telephone described in Attachment A for **a period of 45 days from activation**, during all times of day and night.  This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A2.

b.      The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A2**.**

3.      **Prospective E-911/GPS and Cell Site Triangulation Information.**

a.      All information about the location of the Target Telephone described in Attachment A2 for **a period of 45 days**, during all times of day and night.  This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A2.

b.      The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A2.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of the Wireless Provider. The Wireless Provider is required to disclose the Location Information to the government pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), the Wireless Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Wireless Provider's services.  The government shall compensate the Wireless Provider for reasonable expenses incurred in

Attachment B
Page 2 of 3
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

furnishing such facilities or assistance.

**II.**     <u>Section</u> **II:  Information to Be Seized by the Government**

1.     All information described above in Section I that will assist in investigating unidentified subjects who are engaged in violating 21 U.S.C. §§ 841(a)(1), and 846.

2.     All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.     Location Information regarding the Target Telephone described in Attachment A2.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Wireless Provider in order to locate the things particularly described in this Warrant.

Attachment B
Page 3 of 3
USAO 2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970